In the Matter of RONALD R. BROOKS et al., Appellants, v DALL W. FORSYTHE, as Director of the New York State Division of the Budget, Respondent.

Third Department, March 4, 1993

APPEARANCES OF COUNSEL

*Hinman, Straub, Pigors & Manning, P. C.,* Albany *(William P. Golderman* of counsel), for appellants.

*Robert Abrams, Attorney-General,* Albany *(Patrick Barnett-Mulligan* and *Peter G. Crary* of counsel), for respondent.

**OPINION OF THE COURT**

HARVEY, J.

Petitioners are past or present commissioned officers and one Senior Investigator of the Division of State Police. Pursuant to the terms of their collective bargaining agreements, petitioners receive an overtime premium in lieu of overtime compensation. Under limited circumstances, however, and pursuant to respondent's guidelines (hereinafter Item G-140), petitioners are eligible to earn extreme emergency overtime compensation "if the period during which the work is performed is deemed to be an extreme emergency by the Director of the Budget" *(see also,* Civil Service Law § 134 [6]). The present appeal concerns petitioners' requests for extreme emergency overtime compensation with respect to events occurring at the St. Regis Mohawk Indian Reservation in Franklin County on June 6-12, 1989 and July 20-31, 1989, which involved altercations between Mohawks living on the reservation and the State Police. The confrontations involved the issue of gambling on the reservation, which is not permitted in New York. Previously, State Police had raided the reservation in December 1987 and September 1988 to seize gambling machines and had not met with serious resistance from the Mohawk residents.

The record reveals that the June 1989 events arose after an altercation between anti-gambling Mohawks and employees of the largest casino on the reservation. After approximately 20 members of the State Police responded to the altercation, approximately 500 pro- and anti-gambling Mohawks surrounded the casino. The owner of the casino was arrested and the State Police retreated from the reservation. Later that afternoon, the State Police secured search warrants and raided the reservation in order to seize gambling machines from other casinos. Thereafter, unarmed pro-gambling Mohawks, using automobiles, set up road barricades at two points on State Route 37. Although these barricades soon ended, the State Police were informed that residents were planning to again barricade the access roads to the reservation, this time for at least two days. Approximately 200 State Troopers were subsequently assigned to 12-hour shifts on the reservation and successfully diffused the potentially volatile situation and ensured that access roads remained open.

The July 1989 events arose after approximately 150 Federal Bureau of Investigation personnel supported by nearly 150 State Troopers executed Federal felony arrest and search warrants charging Federal gambling violations on the reservation. Preliminary planning and intelligence indicated that the entire operation would last a maximum of one day and no serious resistance was expected. However, upon approaching the reservation, the State Police were met by a large group of members of the "Warrior Society", a militant, pro-gambling Mohawk faction devoted to preserving territorial sovereignty and traditional law on the reservation by eliminating non-Native American intervention. These individuals were heavily armed with semiautomatic weapons and they constructed various barricades on Route 37 and refused to let nonresidents travel through the barricades. In a letter to the Governor of New York, two Mohawk tribal council chiefs indicated that they viewed the raid as an "invasion" and "act of war" on sovereign territory. State Police personnel were assigned to work 12-hour work shifts on the reservation and, pursuant to a plan formulated previously during the June 1989 events, various detours around the reservation and roadblocks to intercept weapons were set up. This plan remained in effect until 11 days later when the fracas ended with minimal violence.

After petitioners made their requests for extreme emergency overtime for both the June and July 1989 events, the

State Division of the Budget (hereinafter Division) determined that petitioners' request with respect to the June 1989 events would be granted but the July 1989 request would be denied. Petitioners thereafter commenced this CPLR article 78 proceeding to annul the Division's determination refusing to authorize compensation for the July 1989 events. Following joinder of issue, Supreme Court found that the Division's determination was rationally based and dismissed the petition. This appeal by petitioners followed.

■ We reverse. In our view, petitioners have sufficiently established that the determination denying their request for extreme emergency overtime for the July 1989 requests was not rationally based. In denying petitioners' request, the Division determined that the July 1989 events did not meet the criteria set out in the Item G-140 guidelines. Item G-140 mandates that specific criteria be met before a period is designated as a compensable extreme emergency, including: (1) the duration of the emergency, (2) the number of overtime hours required, (3) the necessity to work, and (4) the nature of the emergency. As noted in respondent's determination, two additional criteria are also considered when respondent reviews requests by State Police personnel, namely: (5) the presence of a clear and imminent threat to the public, and (6) use of outside law enforcement agencies in controlling or containing the emergency.[1] In making its determination, the Division basically denied petitioners' request based on criteria (4) and (5). Although petitioners discuss the applicability of all six criteria on appeal, respondent confines its arguments to those two criteria. Given the specific wording of the Division's determination, we deem it necessary to consider only those issues relied upon by respondent.

Criterion (4) in Item G-140, titled "Nature of the Emergency", contains the following explanatory note: "An emergency is a situation that is nonrecurring and one that cannot be forestalled or generally anticipated in advance. Payment

---

1. With respect to these additional criteria, and contrary to petitioners' contentions on appeal, we agree with respondent that consideration of them in this case was not improper. "[A]n agency is free to evolve standards, if consistent with the statutory framework, on a case-by-case basis and to apply them to the individual proceeding at hand" (*Matter of Roman Catholic Diocese v New York State Dept. of Health*, 109 AD2d 140, 148 [Levine, J., dissenting], *revd on dissenting opn below* 66 NY2d 948). We note that here the record discloses that respondent has previously utilized those additional criteria in evaluating similar claims.

should not be made in cases of peak work loads or 'rush' assignments or other high-pressure situations." In its determination, the Division stated that "the State Police could not anticipate the specific response that the Indians would make to the seizure and arrest operation". However, "while the erection of barricades by the St. Regis Indians may have created a high tension situation thereby necessitating the deployment of a large number of State Police personnel, this 'peak workload' situation does not constitute an extreme emergency as contemplated by Item G-140." We find the Division's conclusion that the July 1989 events were generally anticipated by the State Police and simply a "peak workload" situation completely without basis in this record.

Notably, in its determination and respondent's answer, the Division concedes that the State Police could not anticipate the specific response of the Mohawks. Respondent argues, however, that the State Police had to have anticipated some trouble based on the June 1989 events. This contention is disingenuous at best. The June and July 1989 events were quite different in that the June 1989 altercation arose following an incident involving arguments within the Mohawk community itself that escalated to the point of necessitating outside intervention from the State Police to keep order. The July 1989 incident arose when the State Police attempted to execute some warrants, a process that respondent does not dispute the State Police had done before on the reservation without any serious trouble. Although respondent makes much of the fact that, during the July 1989 events, the State Police utilized a roadblock/detour plan they had previously formulated during the June 1989 events but had never been used, this fact does not support the contention that the July events were anticipated. This is because there is no question that this plan was *not* specifically formulated by the State Police for the purpose of future events such as the July 1989 search and seizure operation. The fact that once the July uprising began the State Police were clear-headed enough to remember the previously formulated plan and quickly use it in response to the uprising does not render the uprising "anticipated". Further proof that the situation was not anticipated is the fact that the State Police did not marshall the necessary manpower needed to respond to the situation in advance. It was only *after* the blockade started that additional members of the force from throughout the State were deployed to assist in the crisis.

As these and other factors demonstrate, the record simply does not support the Division's conclusion that the July 1989 events were simply a "peak workload" situation. Throughout the standoff heavily armed teenagers and other residents patrolled the area with semiautomatic weapons. A state of war was declared, State Police from throughout the area were dispatched, employees worked on 12-hour shifts and, until detours were set up, the general public was prevented from using the State highway. Eventually even the Governor's office was involved in negotiations to end the standoff. This type of situation could hardly be labeled "routine" or a recurring phenomenon. Accordingly, we find respondent's reliance on criterion (4) as justification for denying petitioners' request to be irrational.

■ As for criterion (5), this requires only "[t]he presence of a clear and imminent threat to the general public". In its determination, the Division states that the Mohawks' response to the execution of the warrants was to construct "a barricade on Route 37 to prevent the public from entering the reservation". The determination goes on to say that "that response was not a serious threat to the public * * * The State Police were able to control and contain the situation * * * thereby [ensuring] that the motoring public could safely traverse the detour without becoming lost or otherwise encountering difficulty. With the State Police taking action, the welfare of the general public was no longer at risk." In arguing this issue, petitioners highlight the absurdity of any claim by respondent that a situation where armed individuals, including teenagers who form a barricade over a State road, declare war and threaten any non-Native Americans, including trade persons, from entering their residence is not a threat to the general public in conformity with the directive of criterion (5).[2] Apparently recognizing this difficulty, respondent seems to rewrite this requirement; he argues that a specific threat to the general public must last at least three days and because petitioners erected detours for the general public, this criterion was not met.

We cannot adopt this rationale. As previously mentioned,

---

2. In their brief, petitioners argue that the Division inappropriately confined its consideration of who constitutes the general public to non-Native American residents outside the reservation, even though it is the State Police's duty to police and protect inside the reservation as well. Although petitioners make an interesting point, it is not necessary to fully address this issue to annul the Division's determination.

criterion (3) contains no three-day requirement. The only criterion concerning duration is criterion (1), which states only that "an emergency situation must generally be of not less than three days' duration". In this case an emergency situation lasted approximately 11 days. Moreover, if respondent's contention is true that petitioners can only be compensated if the general motoring public is in immediate life-threatening danger for at least three days, then this would render the Division's determination to approve extreme emergency overtime for the Thruway bridge collapse over the Schoharie Creek in Montgomery County impermissibly inconsistent *(see, Matter of Field Delivery Serv. [Roberts],* 66 NY2d 516, 518; *Matter of Callanan Indus. v Rourke,* 187 AD2d 781). In that case, the motoring public was in immediate physical danger only until roadblocks were put up and emergency detours arranged, and there is little question that the State Police did not wait three days to do that. In any event, we find it irrational to conclude that the general public was out of danger in the subject incident until the matter was resolved. While roadblocks and detours did help minimize a potential catastrophe, the fact remains that the public was not out of danger while individuals who were heavily armed and considered themselves to be at war were roaming free. The record evidence supports petitioners' contention that the situation was volatile throughout the standoff and the danger of the conflict was unpredictable. The fact that the conflict eventually ended with little bloodshed was certainly fortuitous, but it is not a rational reason to conclude that no emergency existed in the first place. Consequently, because an "agency acts arbitrarily and capriciously when it fails to conform to its own rules and regulations" *(Matter of Era Steel Constr. Corp. v Egan,* 145 AD2d 795, 799), we conclude that Supreme Court's contrary finding should be reversed.

Mikoll, J. P., Yesawich Jr., Mercure and Crew III, JJ., concur.

Ordered that the judgment is reversed, on the law, with costs, determination annulled and petition granted.