■ In the Matter of JOHN W. WELCH et al., Respondents, v THOMAS A. CONSTANTINE, as Superintendent of the Division of the New York State Police, Appellant. [599 NYS2d 683] —Yesawich Jr., J. P. Appeal from a judgment of the Supreme Court

(Travers, J.), entered March 3, 1992 in Albany County, which, *inter alia,* granted petitioners' application to direct respondent to ask the State Division of Budget for extreme emergency overtime payments.

This appeal concerns petitioners' request for overtime compensation in connection with events occurring at and near the Ganienkeh Indian Encampment (hereinafter the encampment) in Clinton County in March 1990 and April 1990. On March 30 of that year, gunfire from the encampment damaged a Vermont National Guard MEDIVAC helicopter and wounded a doctor on board, forcing the pilot to make an emergency landing on encampment territory. When members of the Division of State Police (hereinafter the Division) sought entry into the encampment to investigate the incident, they were refused entry. Subsequently, a group of Mohawk Indians, members of the militant "Warriors" group, spontaneously set up roadblocks, using vehicles, logs, barbed wire and 100-pound tanks of propane gas, to prevent nonresidents from entering the encampment. After determining that the Warriors were heavily armed with automatic and semiautomatic weapons, the Division, to assure public safety, set up their own roadblocks approximately 100 yards outside of the Warriors' roadblocks, and directed traffic to detour around the encampment. The roadblocks remained in place for an 11-day period, during which time negotiations were underway between the Ganienkeh leaders and State officials.

On the evening of March 31, 1990 it was decided within the Division that no attempt would be made to forcibly enter the encampment; as a result, on April 1, 1990, after the helicopter was returned to the National Guard, many of the additional State Troopers who had been assigned to the area were relieved of duty. Petitioners, who hold the positions of investigator, senior investigator and lieutenant in the Division, were among the personnel who remained on the scene, and their duties included the task of identifying the Warriors who manned the roadblocks by, *inter alia,* forcibly pulling the masks off these heavily armed people and photographing them. On April 3, 1990, petitioners assisted Federal Bureau of Investigation personnel in obtaining a search warrant to enter the encampment; the Warriors refused to honor the warrant. On April 6, 1990, the Warriors intensified their defenses, building new roadblocks and, in addition, patrolling the wooded areas nearby with automatic weapons at all hours. On April 9, 1990, the Division enlisted the aid of the then-City of Syracuse Police Chief to negotiate a settlement, as a result of

which the Division was able to obtain permission to enter the encampment. Division personnel on the scene, including petitioners, were advised at this time to "be prepared to mount an immediate rescue attempt," but the standoff eventually ended peacefully.

After this encounter, petitioners, who may only earn overtime pay if the period for which it is sought has been designated an "extreme emergency" by the Director of the State Division of Budget (hereinafter the Director) (see, Civil Service Law § 134 [6]), asked respondent to submit a request to the Director for overtime in connection with the Ganienkeh incident. Respondent refused, claiming that the emergency situation did not last three days. After pursuing all available administrative appeals, petitioners commenced this CPLR article 78 proceeding seeking to compel respondent to submit such a request. Supreme Court granted the petition, after finding that respondent's refusal to request "extreme emergency" designation for the Ganienkeh incident was arbitrary and capricious, and respondent appeals.

Budget Policy and Reporting Manual Item G-140 (hereinafter Item G-140), the Director's regulation defining an extreme emergency for purposes of determining whether overtime pay shall be awarded, sets out criteria which a situation must meet to be considered such an emergency; one of the criteria is that the emergency must be of at least three days' duration. Respondent argues that the Division's internal decision not to enter the encampment by forceful means effectively ended the true emergency situation. From that point on, it is contended, petitioners performed routine duties incident to "the normal criminal investigative process".

As we recently noted in *Matter of Brooks v Forsythe* (189 AD2d 26, 31), a case arising out of quite similar events at the St. Regis Mohawk Indian Reservation in July 1989, "[t]his type of situation could hardly be labeled 'routine' ". At Ganienkeh, as at St. Regis, the roads were blocked, and Warriors armed with automatic and semiautomatic weapons patrolled the area, including the woods around the encampment, while tense negotiations took place between the Mohawks and governmental leaders. Although in both cases the standoff ended peacefully, the threat to the police and to the public continued as long as the roadblocks were in place and there were heavily armed individuals wandering in the area (see, supra, at 32). Here, the potential for danger to uninvolved members of the public had been amply demonstrated when the helicopter was

shot down; until the matter was resolved, it could not be known whether other terrorist acts would follow.

Although it was initially decided not to storm the camp, over the next several days the circumstances changed and the possibility of using force to enter the Mohawk territory was entertained several times; for example, when the Warriors refused to honor the Federal search warrant, petitioners were advised that if the Warriors continued to deny access, the Division would "forcibly enter the [e]ncampment". On April 5, 1990, Division Captain Kenneth Cook publicly stated that he was "determined" to gain access to Ganienkeh territory, even if the Warriors resisted.

Whether a given incident meets the three-day requirement of Item G-140 must be assessed in the context of the other criteria which are said to make up an emergency. When the events at issue are evaluated in this manner, respondent's determination that the emergency did not last three days is plainly arbitrary and without support in the record. For 11 days, petitioners worked a number of hours "clearly in excess of the hours reasonably required of [their] position[s]"; they were required to work those hours; the events over that entire time period were unanticipated and could not have been forestalled; as noted above, there was a continuing threat to the public; and other law enforcement agencies, among them correction officers and Federal authorities, were involved in the matter.

Petitioners' final point, that respondent's refusal to submit their request for overtime pay was arbitrary in view of its willingness to submit such requests in other situations that are factually similar or less compelling, is also well taken. The Ganienkeh incident was similar in all relevant aspects to the St. Regis incidents and, thus, it was arbitrary for respondent to submit requests in those instances and not to do so here (see, Matter of Field Delivery Serv. [Roberts], 66 NY2d 516, 520).

Respondent's other arguments, including those specifically directed at petitioner Alfred Crary, have been considered and found to be without merit.

Levine, Mercure, Mahoney and Harvey, JJ., concur. Ordered that the judgment is affirmed, with costs.